No. 61.—C. A. L. LAMAR, plaintiff in error, *vs.* THE NEW YORK AND SAVANNAH STEAMSHIP NAVIGATION COMPANY, defendants.

[1.] The New York and Savannah Steam Navigation Company, at some previous period, published printed rates of freight, containing amongst others, this item—" *measurement articles* not enumerated, such as boxes, &c. per foot, 12½." C. A. L. L. produced two boxes containing 2200 cotton samples, and offering to pay the freight thereon, by measure, according to the printed rates, demanded their shipment by the Alabama, one of the Company's vessels. *Cotton samples* was not mentioned in the freight list. It was a new business which had recently sprung up; and it was proven by those who were accustomed to make shipments of these samples, that the customary rates which they were in habit of paying, was one cent per sample, which rates were known to the plaintiff: *Held*, that the Company was not bound to ship these boxes, *as such*, by measure, nor unless paid a cent a sample, the customary rates on such articles.

Case, in Chatham Superior Court. Tried before Judge FLEMING, May Term, 1854.

This was an action brought by the plaintiff in error, against the defendant in error, as common carriers, for damages sustained by their refusal to convey two boxes from Savannah to New York.

The following is the testimony in the cause :

Testimony of C. D. Rhind, witness for Plaintiff: Was in the employment of Mr. Lamar about the month of April, 1852; sent down to the steamship Alabama, which is one of the steamers of the defendants, who are common carriers, two boxes belonging to Mr. Lamar, to be shipped to New York ; they contained Cotton samples, and are the boxes named in the declaration; they were closed up and offered as ordinary merchandise ; witness saw then delivered on the wharf to one Daily, who is in the employment of the company and ships goods for them. Daily said they contained Cotton samples and he would not receive them.   Witness told him that what they contained was none of his business.   He still refused and the goods were put in the ware-house.   This was in the port of Savannah, and in the afternoon.   Witness went down, the next morning, with Mr. Lamar to the wharf; he required the goods to be shipped, took out his purse and offered to pay the usual rates of freight for merchandise ; witness thinks it was 12½ cents per foot. Daily refused to receive it.   While they were discussing the question, Captain Ludlow, the master of the steamship Alabama, came down and said to Mr. Lamar, I have arranged the matter with the agents—we will take the goods on your terms. Witness saw the goods put on board the Alabama, and a short time after saw them taken off and put in the ware-house.   They were not carried by the Alabama.   Mr. Lamar was obliged to have them brought back in a dray to his office, and afterwards to another vessel—they were previously sent by him in his own conveyance to the Alabama.   It cost about a dollar for the drays, 50 cents each time, and it was worth as much to take them in his own conveyance.   I estimate the damage at that amount to him.   I know of no other special damage.

The rates demanded for Cotton samples by the boat were one

cent per sample. I heard of this and believe it to have been so for a short time previous. I do not know of my own knowledge. With the Philadelphia steamships I am acquainted; they charge nothing for samples. Samples are usually sent put up in paper or in baskets; they go in the Purser's room. They require more care than ordinary merchandise. These boxes did contain about 2200 samples. They were not shipped as samples, but as ordinary merchandise. Padelford, Fay & Co. are the agents of the defendants. They usually engage the freights. Mr. Charles S. Arnold is one of the firm. Mr. Arnold called on Mr. Lamar in my presence on the morning I speak of and offered to take the boxes for ten dollars. Mr. Lamar offered the usual rates of freight and would pay no more. The samples were intended to be sent to Euorpe from New York. Mr. Lamar was willing to pay by the printed rates and offered to do so.

Testimony of Daily, for defence: Was in the employment of the defendants and on the wharf when the boxes came down. I refused to receive them, saying they contained cotton samples, unless a certificate of the number of samples was sent down and the money pre-paid. It is the custom of the company to have samples pre-paid, and had been for some time previous. I do not know how long Mr. Rhind called out to me and said it was none of my business what was in the boxes. I told him it was and I would not receive them. It was not my business to collect freights. The boxes were left on the wharf and by a mistake of the Stevedore were put on board the Alabama, but were taken off that night and put in the warehouse. This was in the afternoon of the day the goods came down. The vessel was to sail the next day. Do not know any thing of Captain Ludlow's conversation with Mr. Lamar.

Charles S. Arnold, sworn for defence: I am one of the firm of Padelford, Fay & Co., and was at the time. We were then and are now the agents of the company in Savannah. The freight for cotton samples was one cent per sample. This rate had been established for some time. It was not so originally. We did so in order that those who shipped cotton by our

Lamar *vs.* The N. Y. & Sav. Steamship Nav. Co.

steamers should have an advantage over those who shipped by sailing vessels. We charge nothing for samples when the bales are shipped, but it has become a habit to send samples by the steamer, of cotton on board sailing vessels, which can thus be sold, to arrive, and complete with that on board steamers. This is a new business. It had sprung up within a year or two. After we were informed that Mr. Lamar had sent the boxes down and what they contained, I met him in the evening about 6 o'clock and told him he could not send them without paying for them as samples. The next day, after a conversation with my co-partners, I called upon him and offered to take them for ten dollars. He offered to pay the usual rates of merchandise per foot and no more. I told him the goods could not go. We usually charged from 12 to 15 cents a foot for merchandise. Mr. Rhind was present. Cotton samples have no peculiar intrinsic value, their value is connected with the sales spoken of. I offered the ten dollars in a spirit of conciliation. I thought it probable that the boxes contained about 1000 samples. I know nothing of the conversation with Captain Ludlow. He was not authorized to receive freight, the agents make all contracts for freight. [Here a set of printed rates were shown to witness and are to be taken with this testimony.] These are the rates spoken of. They are the rates from New York to Savannah, and not from Savannah to New York. We have no regular rates from Savannah. The articles on that but come this way, they scarcely ever go back. Those rates have been published by authority and have been circulated here, but they do not regulate the freight from Savannah to New York. If a box of ordinary merchandise were sent we should probably charge those rates. If small articles were sent down to the steamer, I suppose the Captain would receive them and we would take the freight, but he has no right to make engagements for freight; for instance, he could not take a lot of five barrels. (Witness subsequently explained that he used the term five barrels simply as an illustration.) There had been disputes about paying the one cent per sample for some time in

N. York, as the merchants refused to pay it, and we wrote to the president about it. That letter is his reply.

Contents of letter, December 9, 1851. I would charge one cent per sample for cottons, always "prepaid". We had been charging these rates for some time, but as there were disputes with the merchants in New York about it, we wanted the authority of the president.

Mr. Dana, Mr. Harper, and Mr. Mitchel, merchants accustomed to the business, were sworn for defence, to prove that they were in the habit of paying one cent per sample. Mr. Mitchel referred to a note made by himself, to show that on the various occasions, beginning December 20th, 1853, he had paid the rate. He had not looked further back. The witnesses could not say how long the rates had been established. The sending cotton samples was a new business. The rates were not demanded when the Cherokee and Tennessee began to run in 1849. They were demanded by the new boats, Alabama and Florida. Mr. Dana swore that in his business (the sailing vessel line,) he made the contracts for freight, that the master did not contract, but if he received goods they would be sent and freight demanded. The reason why the masters here in their employment do not contract, is because they usually fill up the vessels. As agents, the master has the right to take goods on freight. Mr. Harper swore that he never applied to the agents to take the cotton samples, he sent them frequently and always directly to the steamer herself with the money.

C. D. Rhind recalled, swore: That he knows nothing of the boxes being sent on board the evening they went down to the wharf before the vessel sailed and again taken off; dares say it was done as Mr. Daily says so; but saw them sent on board and put there after Captain Ludlow's conversation with Mr. Lamar, on the morning she sailed, and saw them taken off that morning. The steamer left in the morning. Mr. Lamar's conversation with the Captain was after that with Mr. Arnold in witness' presence.

The printed list of rates above referred to is as follows:

ESTABLISHED RATES OF FREIGHT BETWEEN N. YORK AND SAVANNAH, BY THE STEAMSHIPS FLORIDA AND ALABAMA.

| | |
|---|---|
| Anchors, per lb. | $\frac{1}{2}$ ct. |
| Ashes, pot and pearl, per lb. | $\frac{1}{2}$ |
| Bags, corn and other grain, per bushel, | 10 |
|    Pimento, per bag, | 40 |
|    Pepper,   " | 25 |
|    Ginger,   " | 25 |
|    Trace chains and the like, per lb. | $\frac{1}{2}$ |
| Butter, kegs, tubs or other packages, per lb. | $\frac{1}{2}$ |
| Barrels, beef, pork, fish, beer, cider, salt, pitch, tar, turpentine, rosin, plaster paris, cement, | $62\frac{1}{2}$ |
|    Potatoes, apples, nuts, bread, flour and other light goods in flour barrels, | 50 |
| Half barrels, beef, pork, fish, beer and tongues, | $37\frac{1}{2}$ |
|    Flour, bread, buckwheat and crackers, | 30 |
| Quarter barrels,     do       do | 15 |
| Eighth barrels,      do       do | 10 |
| Boxes, lemons and oranges, each | 50 |
|    Soap, | 20 |
|    Candles, chocolate, olives, anchovies, vermicelli, pipes, macaroni, starch, pepper, almonds, | 15 |
|    Herrings, raisins and prunes, each | 10 |
|    Segars, quarter boxes, each | $12\frac{1}{2}$ |
|    Axes, one dozen, | 25 |
|    Window glass, 50 feet, each | 10 |
|    Wine, oil, cordial, 1 doz each | 25 |
| Baskets, champagne (or boxes) each | 50 |
| Bellows, 30 inches or under, each | 75 |
|    Over 30 inches, | 1 00 |
|    Brick, tile, slate, &c. per 1000, | 10 00 |
| Bundles, frying pans, shovels, scythe blades, 1 doz each | 50 |
|    Straw knives, rice hooks, 1 doz each | 20 |

| | |
|---|---|
| Brooms, broom handles, per doz | 25 |
| Clothes brooms, hearth brushes, per doz | 15 |
| Cart wheels, each | 1 50 |
| Coach and chair wheels, each | 50 |
| Carboys, aqua fortis and oil vitriol, on deck, each | 1 25 |
| Carriages, four-wheel coaches and standing top barouches, each | 20 00 |
| do without dicky seat, | 15 00 |
| Buggies and buggy wagons, each | 10 00 |
| Falling top barouches and phætons, each | 12 00 |
| Gigs, sulkeys, wagons without tops, | 6 00 |
| Stages on deck, | 20 00 |
| Under deck, each | 25 00 |
| Ox carts, each | 10 00 |
| Single horse carts, each | 6 00 |
| Chests, tea, each | 50 |
| Half chests, each | 30 |
| 13 lb. boxes, | 15 |
| 6 lb. do | 10 |
| Coffee, bags, barrels or casks, per lb. | $\frac{1}{4}$ |
| Cheese, casks or boxes, per lb. | $\frac{1}{2}$ |
| Copper, in cases or loose, per lb. | $\frac{1}{2}$ |
| Collars, per doz | 40 |
| Cultivators and corn shellers, each | 75 |
| Chairs, usual sizes, per doz | 3 50 |
| Fancy chairs, in boxes, per foot, | 10 |
| Demijohns, empty, 3, 4 and 5 gallon, each per gal. | 03 |
| Filled, each per gal. | 10 |
| Drums, figs or raisins, | 10 |
| Half drums, | 06 |
| Hams, loose, each | 10 |
| In casks, barrels or boxes, per lb. | $\frac{1}{2}$ |
| Hogsheads or casks, copperas, sugar, coal, | $\frac{1}{4}$ |
| Horses or mules, on deck, shipper to find feed and stalls, each | 25 00 |
| Horned cattle, do do | 20 00 |
| Iron, bars, pigs, castings or hollow ware, of all des- | |

criptions not otherwise mentioned, wire, cannon,
cannon balls, chain cables, graplins, chests, rail-
ings, shear moulds, sheet iron, anvils, smoothing
irons, rail-roadwheels, per lb.                                        $\frac{1}{2}$

Jack screws, each                                                     75

Jars, grapes, large, 60c.—small, 40c.
    Snuff,                 50                      30

Kitts, salmon or other fish, each                                     25
Lead, sheet in rolls, pigs or bars, per lb.                           $\frac{1}{2}$
Lard, kegs or barrels, per lb.                                        $\frac{1}{2}$
Leather, sole, per side,                                              10
Liquors, barrels or casks, per gal.                                   $2\frac{1}{2}$
Marble or stone, dressed or rough, per foot,                          10
Millstones, per lb.                                                   $\frac{1}{2}$
Nails, per keg,                                                       25
Paper,
    Printing, per ream,                           $31\frac{1}{4}$
    Sheathing, per lb.                            $\frac{1}{2}$
Plaster Paris, in bulk, per lb.                                       $\frac{1}{2}$
Paint, dry or in oil,                                                 $\frac{1}{2}$
Ploughs, all sizes, each                                         1 00
Portable furnaces,                                                    25
Quicksilver, each flask,                                         1 00
Rocking chairs, each chair,                                      1 00
Steel, bars or bundles, per lb.                                       $\frac{1}{2}$
Salt, in sacks or casks, per bushel,                                 10
Stills, copper or iron, per gal.                                     05
    Worms for stills, per foot,                   10
Shot, per lb.                                                         $\frac{1}{2}$
Saws, saw-mill and cross-cut saws, per doz.                     1 00
Stone Ware, per gallon, if loose,                                   04
    In crates or casks, per foot,                 10
Straw cutters, framed, each                                     1 00
Specie, gold or silver,                                   $\frac{1}{8}$to$\frac{1}{4}$p.c.
Tin plates or pigs, per lb.                                           $\frac{1}{2}$
Tobacco, kegs, casks or boxes, per lb.                               $\frac{1}{4}$
Measurement articles not enumerated above, such

as boxes, bales, trunks, dry casks, crates, hampers, bale rope, cordage, band boxes, sieves, bundles leather, matting, stoves and stove pipes, sacks or crates, bottles, nests of tubs, pails or other wooden ware, baskets, bags of almonds, nuts, corks, pine-apple cheese, fruit trees and shrubbery, cotton bagging, duck, willow ware, porter in casks, per foot,                                         $12\frac{1}{2}$

Vices, each                                                                            20

☞If extra valuable packages are shipped, the value must be declared and paid for accordingly, to hold the ship responsible.

☞Shipments of specie must, in all cases, be made known at the office of the agent, before going on board.

☞Not accountable for goods shipped, when bills of lading have not been obtained.

☞Small single packages charged according to value.

☞Goods will be landed on arrival, and if not taken away, will be stored at the risk of the consignee.

☞The weight of all articles shipped by weight, to be furnished by the shippers, before the bills of lading are signed.

☞Not accountable for rust on iron, steel, wire or hollow ware; nor breakage of stone ware, glass, marble, curb and free stone, or hollow ware castings.

☞No bill of lading to be signed less than 75 cents freight.

☞All bills of lading signed by the clerk on board.

For freight or passage, apply to

SAMUEL L. MITCHELL, 194 Front-st. N. Y.

PADELFORD, FAY & CO. Savannah.


And thereupon, the Court charged the Jury, as is hereinafter stated in the decision of his Honor. And the plaintiff, by his Counsel, further asked his Honor to charge, that notice of any variation of the general rule, that the master was entitled to make contracts for freight, must be brought home to plaintiffs, before his rights could be effected by such variation, and

his Honor refused so to charge; to which charge and refusa so to charge, the said plaintiff, by his Attorney, excepted.

The Jury, under the charge of his Honor, rendered a verdict for the defendant; whereupon, Counsel, during the said term, and before the adjournment thereof, for the plaintiff, moved for a new trial on the following grounds:

1st. That the verdict is contrary to law.

2d. That the verdict is contrary to evidence.

3d. Because his Honor, the Judge, erred in charging the Jury, that if the defendant was in the habit of charging one cent per sample for the freight of cotton samples, that the plaintiff was bound to tender the one cent per sample, before defendant could be obliged to accept the boxes in plaintiff's declaration, mentioned as freight, although the printed and published rates of freight issued by the defendant comprised such boxes as were tendered for freight by plaintiff, at other rates of freight, which last mentioned rates of freight were offered to be paid by the plaintiff.

4th. Because his Honor, the Judge, erred in charging the Jury, that if the defendant was in the habit of charging certain persons one cent per sample for the freight of cotton samples, that the plaintiff was bound to tender one cent per sample, before the defendant could be held liable for not receiving and carrying said boxes, although said boxes were comprised amongst articles printed and published by defendants among their rates of freight, to be by them transported and carried at other rates of freight, which last mentioned rates of freight were tendered by plaintiff, and no knowledge brought home to plaintiff, of other than the printed rates of freight.

5th. Because his honor, the Judge, erred in charging the Jury that the defendant was not liable for the refusal to carry the boxes in the plaintiff's declaration mentioned, although the master of the said Alabama had agreed to carry said boxes at the rates of freight proposed and offered by plaintiff, and had received the boxes on board said steamer.

6th. Because his Honor, the Judge, erred in charging the

Jury that the master of said steamer Alabama, in said declaration mentioned, had no power to make any contract for the transportation and freight of the boxes in said declaration mentioned, if there was an agent in the City of Savannah whose duty and business it was to contract for freight for said steamer.

7th. Because his Honor, the Judge, erred in charging the Jury, that whilst the rule of the law was, that the master of the vessel was the proper person to make contracts for freight, yet if they found that in this case that power had been denied him, the plaintiff was not entitled to recover, although no notice of the denial of said power to the master was brought home to the plaintiff.

8th. Because his Honor, the Judge, erred in refusing to charge the Jury, when requested by plaintiff's Counsel, that notice of any variation of the general rule, that the master was entitled to make contracts for freight, must be brought home to the plaintiff, before his rights could be affected by such variation.

And it was then agreed between Counsel, that the said motion for new trial should be argued in vacation; and in pursuance of said agreement, the said argument was had, and his Honor, on the          day of January, in the year 1855, overruled the motion for a new trial, and filed the following decision:

C. A. L. Lamar
*vs.*
New York and Savannah Steam Navigation Company.      } Motion for new trial.

This action was brought to recover damages, because the defendants, being common carriers, refused to carry two certain boxes, although the plaintiff tendered the freight of twelve and a half cents per foot, that being the printed rate of freight for the transportation of boxes. The defendant refused, because the boxes contained cotton samples, the freight on cotton samples being one cent per sample.

The freight list does not mention cotton samples. The pro-

bability is, that at the time the list was printed, the custom of sending on cotton samples had not begun. Indeed, the testimony discloses the fact, that the sending of cotton samples was a new business. "The rates were not demanded by the Cherokee and Tennessee, but were demanded by the new boats Alabama and Florida." · Every merchant who testified on this subject, says he was in the habit of paying one cent per sample. This rate of freight seems to have been uniform, from the time that freight was first demanded for cotton samples, to the time that these boxes containing samples, were offered for shipment.

I charged the Jury that if they found the fact that the freight for cotton samples was one cent per sample, that the plaintiff could not get rid of this freight by putting his samples in a box. I don't know that the reason for charging this freight can affect the question, but if it does it is against the plaintiff, because the advantage to the merchant is the same whether the samples are sent loose or in a box. That advantage I understand to be this: it enables merchants to ship in sailing vessels for a less freight than by steamer, and yet he secures the benefit of the steamer's speed, as he can sell his cotton by sample before it arrives. The price charged by the steamer for this advantage is one cent per sample—can it be that a merchant may avail himself of the steamer's speed to sell his cotton and avoid paying for the advantage, by simply putting his samples in a box? The fact that cotton samples are not mentioned in the printed list does not vary the question, *if the fact be established* that one cent per sample is the freight uniformerly charged and paid for samples. For example, the freight on a tea-chest is fifty cents.

Does any one suppose that a merchant may avoid the payment of this freight by putting the chest in a box? Certainly not. Now why? Not because tea-chests are mentioned in the freight list, but because this is the *usual freight* for tea-chests. The principle depends upon the *fact*—not upon the *manner* in which the fact is proven. The usual freight may be proven by the freight list—but if the particular article is not upon the freight list, the usual freight may be proven by witnesses. I

repeat, the application of the principle depends upon the *fact* and not upon the *manner* in which the fact may be proven. Let it be assumed that the usual freight on cotton samples was one cent per sample, (and this fact was left to the Jury,) then I say now, as I said to the Jury on the trial, that the plaintiff' cannot avoid this freight by putting the samples in a box. One more illustration and I am done with this point. The freight on dead bodies I believe is ten dollars. Dead bodies are not mentioned in the freight list. Is this company bound to carry dead bodies, and the freight by the size of the coffin or box in which the body may be enclosed? So much as to the first proposition of Counsel, that the defendant was bound as a common carrier, to carry these samples for freight according to their printed rate for boxes.

The second proposition of Counsel is, that the defendant was bound by the contract of the Captain.

Two questions arise upon this proposition—one of fact: did the Captain contract? The other of Law: if the Captain did contract, was the defendant bound by his contract?

First. Did the Captain contract? The only evidence upon this subject is, that the Captain came down while the plaintiff and witness were talking with the agent of the company for shipping goods, Mr. Daily, and who had refused to receive the boxes, on the ground that they contained cotton samples, and said to plaintiff, "I have arranged the matter with the agents'; we will take the goods on your terms". Is this proof of a contract by the Captain? I think not. To my mind it only proves that the Captain informed the plaintiff that the agent had agreed to receive his boxes. If the agents did so agree, the Captain could have proven the fact, but no such proof was offered. If the Captain did not contract, there is an end of the matter.

I however charged the Jury, that if they found, under the testimony, that the defendant had an agent present whose duty it was to make contracts for freight, that the defendant would not be bound by a contract made by the Captain. Mr. Arnold proves distinctly, "that Padelford, Fay & Co. are the agents of

the defendant in Savannah; that the Captain *is not authorized* to receive freight, but that the agents make *all contracts* for freight". The fact is not stated in the brief of the testimony, but it was mutually admitted by Counsel in the argument of this motion, that Mr. Arnold proved that Mr. Padelford and Mr. Fay were part owners. These gentlemen, then, according to the testimony for themselves, and as agents for the other owners, made all contracts for freight. I admit that "when a vessel is intended to be employed as a general ship, and the ·owners *do not interfere* with the receipt of the cargo, they are ·bound by the contracts of the master, notwithstanding the ship ·may be at their place of residence". But here the proof is, that the owners did interfere, Padelford and Fay being part owners, and Padelford, Fay & Co. being agents for the other owners in regard to this very matter of making contracts for freight.

But it is argued that "constant usage shows that the master has a general authority, and if a *more limited* authority is given, the party not informed of it is not affected by such limitation". Granted—but is the party in this case not informed of it? If the Captain has made this contract, (which I deny,) by what authority did he make it? By his general authority as master? Not at all. On the contrary, he says that he had *arranged it with the agents.* Is not this notice to the plaintiff, that he claimed no authority in the premises as master? If the agents gave him *special* authority to make the contract in this case, that fact ought to have been proven. Nor is this the only evidence of notice to the plaintiff. The evening previous Mr. Arnold informed the plaintiff that he could not send the boxes unless they were paid for as samples. We find Mr. Lamar, the next day, offering to Mr. Arnold to pay the usual rates of merchandise per foot. Does not this show knowledge in Mr. Lamar that Mr. Arnold had control of this matter?

This question of notice, it seems to me, is not a very important one, under the facts of this case, inasmuch as the boxes were not actually carried. If they had been carried, under a ·contract with the Captain, the company would have been bound,

unless they could bring home notice to the plaintiff that the Captain had no authority ·to make the contract.    But if the Captain makes a contract which he is not authorized to make, and the owners repudiate the contract *before it is executed*, and refuse to carry it into effect, they only do what they have the right to do.    In such a case, (and that is the present case,) the plaintiff, to recover damages, must prove that the Captain acted within the scope of his authority.    The defendant need not prove knowledge in the plaintiff that the Captain had no authority.

The right *to reject a contract made for you without authority*, depends not upon the *knowledge* of the party with whom the contract is made, but upon the *fact* that the agent had no authority.    Whether, therefore, the Captain made this contract by virtue of his general authority as master, or by virtue of a special authority given in this particular case matters not, as the contract was repudiated before execution.    The liability of the company must depend upon their right to *repudiate ;* their right to repudiate must depend upon the authority of the master to contract, and the burthen of proof, in my judgment, is upon the plaintiff to prove this authority.    He has not done so ; on the contrary, the general authority of the master has been negatived by the testimony, and there is not a particle of proof to show a special authority.

The motion for new trial is refused.

W. B. FLEMING, Judge E. D. Ga.

And the Counsel for plaintiff tenders his bill of exceptions to said decision and says:

1st. That his Honor erred in refusing to grant a new trial, on the grounds set forth in the motion of the plaintiff.

2d. That his Honor erred in over-ruling the third, fourth, fifth, sixth, seventh and eighth grounds of the motion for a new trial, tendered by the Counsel for plaintiff.

LLOYD & OWENS, for plaintiff in error.

LAW & BARTOW, for defendants.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The argument of this case has taken a pretty wide range—though not more so than did the testimony and the decision of the Court, on the trial below. We shall confine our judgment to the case made by the pleadings. For the sake of accuracy, I herewith insert the declaration and answer filed in this case:

"The petition of Charles A. L. Lamar sheweth, that the New York and Savannah Steam Navigation Company have endamaged your petitioner in this, to wit: For that whereas the said New York and Savannah Steam Navigation Company, a corporation under the laws of the State of Georgia, before and at the time of the committing of the grievances as hereinafter next mentioned, was the owner and proprietor of a certain steamship called the Alabama, to wit: a steamship plying between the port of Savannah, in the State of Georgia, and the port of New York, in the State of New York, for the carriage and conveyance of passengers, and also of freight for a reasonable hire and reward, between said ports, and being so, the owner of said steamship had advertised for freight for the same for a voyage from the said port of Savannah to the port of New York, for certain specified rates by said defendant, agreed upon and published, and was then and there a common carrier, and subject to all the duties and liabilities by the law imposed upon it, as such common carrier as aforesaid.

And whereas, also, while the said New York and Savannah Steam Navigation Company was such owner and proprietor and such common carrier, and had so advertised for freight with certain rates by it put forth and published, to wit: on the twenty-eighth day of February, in the year of our Lord one thousand eight hundred and fifty-two, to wit, in the county aforesaid. Your petitioner being desirous of sending certain, to wit, two boxes from the port of Savannah to the port of New York, caused to be placed on board the said steamship Alabama, two boxes about eight feet long and two feet wide,

marked Robert Collins, New York, and then and there request-
ed the said New York and Savannah Steam Navigation Com-
pany to transport the said boxes to the said port of New York,
your petitioner then and there tendering to the said New York and
Savannah Steam Navigation Company the freight of said box-
es, either by measure or weight, as set forth in their published
rates of freight.   Yet the said New York and Savannah Steam
Navigation Company, not regarding its duty in that behalf,
but contriving to defraud and injure your Petitioner, did not
and would not convey and carry said boxes to the said port of
New York, but removed the said boxes from the said vessel,
and utterly refused to transport and carry the same, by means
of which refusal of the said New York and Savannah Steam Nav-
igation Company, and of its breach of duty as such common car-
rier as aforesaid, your petitioner was put to divers expenses in
wharfage and drayage and in the employment of divers persons
to remove said boxes and re-ship the same, and was also great-
ly delayed and injured in his business, for that he was unable
to sell divers cottons at large prices and advances, from said re-
fusal of the said defendant to convey the boxes aforesaid, con-
taining the samples thereof.

And your petitioner in fact saith that the refusal of the said
New York and Savannah Steam Navigation Company, and
their breach of duty as such common carrier as aforesaid, hath
endamaged your petitioner in the manner aforesaid, one thou-
sand dollars, and thereupon he brings suit.   Wherefore, your
petitioner prays process may issue requiring the said New York
and Savannah Steam Navigation Company to appear and an-
swer in the premises.        LLOYD & OWENS,
                                  *Attorneys for Petitioner.*"

"THE NEW YORK AND SAVANNAH ⎫
   STEAM NAVIGATION COMPANY ⎬ *Chatham Superior Court.*
            *vs.* ⎪
     CHARLES A. L. LAMAR. ⎭

And the said defendant, The New York and Savannah
Steam Navigation Company, by its Attorneys, Law & Bartow,
comes and defends the wrong and injury, when, &c. and says

that the said defendant, the New York and Savannah Steam Navigation Company, is not guilty of the said supposed grievances above laid to its charge, or any or either of them, or any part thereof, in manner and form, as the said plaintiff hath above thereof complained against it.   And of this the said defendant puts itself upon the country, &c.

And for further plea in this behalf, by leave of the Court, have first had and obtained, the said defendant says that the said plaintiff ought not further to have and maintain his said action thereof against this defendant, because the said defendant says, that if there was any such refusal by this defendant to transport the said boxes of the said plaintiff, as in the said plaintiff's declaration is alleged, the same was occasioned by the said plaintiff's refusal, on his part, to pay and allow to this defendant the usual and customary charge and compensation on freights for the transportation of samples of cottons, which composed the contents of said boxes, and this defendant is ready to verify.   Wherefore, the said defendant prays judgment if the said plaintiff ought further to have or maintain his said action thereof against this defendant.

LAW & BARTOW,<br>*Defendant's Attorneys.*"

Thus it will be perceived, that Mr. Lamar, the plaintiff, claimed to recover damages of the defendants as common carriers, for not transporting two boxes in the steamship Alabama, from the port of Savannah to the port of New York, notwithstanding a reasonable hire or reward was tendered for said service, according to specified rates agreed upon and published by the defendants.   The defendants pleaded the general issue, and insisted that if there was any such refusal, on their part, as that complained of, it was because the plaintiff failed or refused to pay the customary compensation for the transportation of his goods.

The issue, therefore, made by the pleadings is, did the plaintiff offer to pay the usual rates for the service which he required?   That question, we think, was properly submitted by

his Honor, Judge FLEMING, to the Jury; and the verdict having been found for the company, it should not be disturbed. Moreover, we think the plaintiff acted under a misapprehension, as to the duties and liabilities of the company, connected with this transaction.

It seems, from the proof, that sometime since, hand-bills were published and circulated, purporting to contain the established rates of freight between New York and Savannah, by the steamships Florida and Alabama. Toward the close of this list is this item: "Measurement articles, not enumerated above, such as boxes, &c. per foot, 12½." Under this item, Mr. Lamar insisted on shipping two boxes, which were closed up and which contained 2200 cotton samples, as ordinary merchandise, at twelve and a half cents per foot, and no more. The rates demanded for cotton samples, by the boat, were one cent per sample. The merchants who were sworn on the trial, testified that they were in the habit of paying one cent per sample. Mr. Rhind, the witness for the plaintiff, admits that he had heard of this, and believed it to have been the rates charged, before these boxes were offered. This was a new business which had sprung up recently; and these rates were established in order that those who shipped cotton by the steamers, should have an advantage over those who shipped by the sailing vessels. Nothing was charged for the samples when the bales were shipped by the steamer. But to counteract the preference given to the steamers, it had become a habit to send samples, by the steamer, of cotton on board the sailing vessels, which could be sold by the samples, to be delivered on its arrival, and thus compete with that on board the steamers.

Was it right that the plaintiff should derive this benefit from the transaction, and not make adequate compensation? With this adventitious value attached to these cotton samples, should they not have been taxed higher than ordinary merchandise? Were the owners of these steamships to be compelled, as common carriers, to commit pecuniary suicide? to become the authors of their own undoing? The injury resulting to the company, as well as the benefit accruing to the shippers of cotton,

justified this extra charge. Even the printed rates provided that if extra valuable packages were shipped, the value must be declared and paid for accordingly; otherwise, the ship would not be held responsible. And it is too limited a view of the subject to hold that this extra value was restricted to the *intrinsic* value of the article merely.

From the fact that shipments of specie were required, in all cases, to be made known at the office of the agent, before going on board, it is contended that other articles, not enumerated, came under the head of ordinary merchandise. The presiding Judge put this point, we think, strongly in his charge to the Jury. " The fact", said he, " that cotton samples are not mentioned in the printed list, does not vary the question, *if the fact be established* that one per cent. per sample is the freight uniformly charged and paid for samples. For example, the freight on a tea-chest is fifty cents. Does any one suppose that a merchant may avoid the payment of this freight, by putting the chest in a box? Certainly not. Why? Not because tea-chests are mentioned in the freight list, but because this is the *usual freight* for tea-chests. The principle depends upon the *fact*, not upon the manner in which the fact is proven. The usual freight may be proven by the freight list, but if the particular article is not upon the freight list, the usual freight may be proven by witnesses. Let it be assumed that the usual freight on cotton samples is one cent per sample (and this fact was left to the Jury) I say now, as I said to the Jury on the trial, that the plaintiff cannot avoid this freight, by putting the samples in a box. One more illustration, and I am done with this point. The freight on dead bodies is, I believe, ten dollars. Dead bodies are not mentioned in the freight list (neither are cotton samples). Is this company bound to carry dead bodies at the freight by the size of the coffin or the box in which the body may be enclosed.?"

I will only add, that the law which *forces* common carriers to transport freight at the usual rates, is, itself, an exception to the voluntary principle upon which other contracts are

founded, *and of doubtful expediency.* We are unwilling to extend the doctrine any further than it has gone.

Whether Captain Ludlow, the master of the vessel, was authorized to make a special agreement with Mr. Lamar, relative to this freight, at the place of the residence of the part owners and agents of the ship, who were personally present, interfering in the matter and virtually repudiating the contract, if, indeed, any such were made, we have deemed it unnecessary to decide. Suffice it to say, that this action is not brought to recover damages for the breach of any such supposed agreement. The doctrine upon this point will be found to be very clearly stated by Mr. *Flanders,* in his Treatise on Shipping. (§141, 147 and 477, and the notes thereto appended. *Abbott on Shipping,* 161, note 3. *Story on Agency,* §116. 6 *Cowen's Rep.* 173. 11 *Mass. R.* 99. 3 *Pick. Rep.* 495 *and* 3 *Sumner C. C. Rep.* 228.) In this last case, Judge *Story,* devoted as he was to this branch of the science—Maritime Law—has exhausted all the learning of the books upon this subject.

Judgment affirmed.